IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 10, 2016

**MARCIE LYNN PURSELL v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2007-B-948     J. Randall Wyatt, Jr., Judge**

_____

**No. M2015-01375-CCA-R3-PC – Filed July 5, 2016**

_____

Petitioner, Marcie Lynn Pursell, appeals from the denial of her petition for post-conviction relief, arguing that she received ineffective assistance of trial counsel for failure to have expert witness testimony excluded, failure to impeach expert witnesses with prior inconsistent statements, and for lack of experience. The decision of the post-conviction court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Manuel B. Russ, Nashville, Tennessee, for the appellant, Marcie Lynn Pursell.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Glenn Funk, District Attorney General; and Brian K. Holmgren, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Procedural History and Factual Summary*

Petitioner was convicted of three counts of aggravated child abuse for injuries inflicted upon her newborn son, and she received three concurrent fifteen-year sentences. Her judgments of conviction were affirmed on direct appeal. *State v. Marcie Lynn Pursell*, No. M2011-00286-CCA-R3-CD, 2013 WL 1279662 (Tenn. Crim. App. Mar. 28, 2013), *perm. app. denied* (Tenn. July 10, 2013). Petitioner filed a petition for post-

conviction relief on July 8, 2014, and filed an amended petition with the assistance of appointed counsel on March 3, 2015. The amended petition alleged that she received ineffective assistance of counsel at trial. After a full evidentiary hearing, the post-conviction court entered an order denying relief on July 13, 2015.

The evidence at trial basically established the following:

> The victim suffered bone fractures to his femurs, tibia, pelvis, upper right arm, and ribs over the course of three or four weeks. The victim suffered approximately fourteen rib fractures. These injuries were inflicted during the first six weeks of the victim's life. The expert testimony established that the fractures were caused by direct blows or some form of trauma to the victim's pelvis; jerking, yanking, or twisting the victim's arms and legs; and squeezing or shaking the victim's abdominal area.

*Id.* at *23. The jury rejected Petitioner's theory that the victim's injuries were accidentally caused by someone else in her home or by medical personnel after the victim was hospitalized. *See id.* at *22-23. The State's medical expert testimony came primarily from three witnesses, Dr. Heller, Dr. Greeley, and Dr. McMaster.

> Each doctor stated that the procedures performed on the victim were conducted daily on infants across the country and that no medical evidence showed the procedures resulted in bone fractures. Dr. Heller testified that the victim's bones were normal and not susceptible to fractures and that the victim did not have a genetic bone disease, such as rickets or [osteogenesis imperfecta], that would render the victim's bones brittle.

> Dr. Heller stated that the type, location, and various rates of healing led him to conclude that the fractures were caused by direct blows and squeezing of the ribs on at least three occasions. Dr. Greeley and Dr. McMaster concluded the fractures were inflicted on three different occasions. Dr. Greeley concluded that the victim's fractures were the result of child abuse and that the victim's lack of new fractures after being released from the hospital in January 2007 supported that conclusion. Dr. Greeley considered and excluded genetic bone disorders and vitamin deficiencies and concluded the victim's feeding difficulties did not contribute to the fractures. Dr. McMaster concluded that the victim's rib fractures were caused by squeezing the victim's chest and torso with adult-size hands and that his extremity fractures were caused by jerking or shaking. Dr. Heller gave similar testimony. Although the evidence showed that dating the victim's fracture[s] was an approximation rather than an exact mathematical calculation, Dr. Greeley testified that the fractures

could not have been inflicted after the victim's December 27, 2006 hospital admission.

*Id.* at \*22.

The evidence from the post-conviction hearing showed that, once the State began conducting an investigation into the potential child abuse, Petitioner retained her paternal uncle to represent her. Her uncle was primarily a transaction lawyer with almost forty years of experience. He also had some experience with commercial litigation and with some juvenile court matters. Petitioner's uncle had minimal criminal defense experience and had not handled a criminal trial before. He went with Petitioner to the police station when she was initially interviewed by law enforcement officers and continued to represent her when the State eventually initiated dependent and neglect proceedings in juvenile court. Petitioner successfully defended against the dependent and neglect petition. *See generally State v. Marcie Lynn Pursell*, No. M2008-01625-CCA-R9-CD, 2009 WL 2216562 (Tenn. Crim. App. July 23, 2009), *perm. app. denied* (Tenn. Jan. 25, 2010).

Before the juvenile court proceedings concluded, the State brought criminal charges against Petitioner. Petitioner, with the support of her family, retained co-counsel to handle the criminal prosecution because of Petitioner's uncle's lack of criminal defense experience. At the time of the trial, co-counsel had fifteen years of criminal law experience and had participated in about fifteen criminal trials. Co-counsel also had some involvement in the juvenile court proceedings.

Petitioner considered the "lead attorney" to be her uncle, but she was concerned about his lack of experience with criminal law. Petitioner was "under the impression that [co-counsel] was just there for the formalities to . . . actually do the paperwork that he wanted done." Petitioner claimed that her uncle primarily discussed her case with her father rather than directly with her.

Petitioner's uncle acknowledged that he was unfamiliar with criminal procedure and explained that was the reason co-counsel was obtained. Because his firm handled some medical malpractice and he had extensive civil experience, Petitioner's uncle "was merely going to try to assist in the matter as it relates to some of the issues associated with the medical issues."

The two attorneys "had conversations on a fairly regular basis" and worked together to develop their case. Co-counsel drafted all of the pleadings with some input from Petitioner's uncle. Petitioner's uncle was "a really strong writer" and offered helpful editing feedback. Because Petitioner's uncle understood the medical proof "much better" than co-counsel, he "took the lead" on the medical issues, and co-counsel ensured

that all of the criminal procedures were followed and that all the substantive criminal matters were handled. At trial, Petitioner's uncle "handled all of the medical proof, medical-type witnesses, and [co-counsel] handled the civilian witnesses."

Co-counsel initiated and arranged most of the meetings with Petitioner. They reviewed the evidence, discussed the strengths and weaknesses of the case, and reviewed the State's plea offers. Co-counsel mostly discussed the case with Petitioner and did so on occasions when Petitioner's uncle was not present. Petitioner's uncle recalled meeting with Petitioner once in jail with co-counsel and "on a couple of occasions" in court.

The defense strategy was to raise reasonable doubt that Petitioner caused the injuries sustained by the victim. The defense suggested that either someone else with access to the victim or someone involved in the victim's medical treatment caused the injuries. The defense also presented the possibility that the victim's wounds were primarily caused by individual medical conditions related to the fact that the victim was born prematurely and had difficulty feeding.

At trial, Petitioner's uncle cross-examined the State's medical experts and directly examined the defense's medical experts. He admitted that he was "fairly aggressive" with some of the "overly opinionated" medical experts but not all of them. Co-counsel "thought [Petitioner's uncle] did a good job" and "was very thorough, particularly with all of the medical proof." Because part of their defense theory was that the medical professionals were responsible for causing the victim's injuries, Petitioner's uncle cross-examined them about their potential bias and motive to be dishonest because their employer would have been liable if they were responsible for the victim's injuries.

Through discovery, one of the State's medical experts, Dr. Amy McMaster, acknowledged that she did not personally examine the victim and indicated that her expert opinion relied on findings of other people, such as radiologists. The defense sought to exclude the testimony of Dr. McMaster as cumulative. During the hearing on the motion, the trial court did not allow Petitioner's uncle to question Dr. McMaster in as much detail as he wanted. The trial court did not exclude Dr. McMaster's testimony. At trial, Dr. McMaster testified to the existence of a bone fracture that she had not identified prior to trial and that also had not been identified by the radiologists. Petitioner's uncle cross-examined Dr. McMaster on this issue. However, at the post-conviction hearing, Petitioner's uncle claimed that, if he had been permitted to go more in depth during the hearing, he might have had more concrete prior inconsistent testimony to use for impeachment at trial.

Additionally, Petitioner's uncle thought that the trial court issued a ruling that prevented the introduction of prior testimony from the juvenile court proceedings. Co-counsel said that the trial court prohibited the defense from bringing up the outcome of

the juvenile court case, but she did not remember the trial court prohibiting them from using prior inconsistent statements from those proceedings.

In hindsight, Petitioner's uncle thought that they should have appealed the trial court's evidentiary ruling with regard to Dr. McMaster. Co-counsel was not aware of anything that was not taken care of in preparation for the trial and felt that they worked diligently in their representation.

*Analysis*

On appeal, Petitioner argues that her trial counsel provided ineffective assistance because (1) trial counsel failed to have the medical experts' testimony excluded; (2) trial counsel failed to impeach one of the medical experts with a prior inconsistent statement; (3) trial counsel failed to have prior testimony admitted from a previous proceeding; and (4) one of her attorneys was too inexperienced with criminal law.

Post-conviction relief is available for any conviction or sentence that is "void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. In order to prevail in a claim for post-conviction relief, a petitioner must prove his factual allegations by clear and convincing evidence. T.C.A. § 40-30-110(f); *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

Both the Sixth Amendment to the Constitution of the United States and article I, section 9 of the Tennessee Constitution guarantee the right of an accused to the effective assistance of counsel. In order to sustain a claim of ineffective assistance of counsel, a petitioner must demonstrate that counsel's representation fell below the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Under the two prong test established by *Strickland v. Washington*, 466 U.S. 668, 687 (1984), a petitioner must prove that counsel's performance was deficient and that the deficiency prejudiced the defense. *See Burnett v. State*, 92 S.W.3d 403, 408 (Tenn. 2002). Because a petitioner must establish both elements in order to prevail on a claim of ineffective assistance of counsel, "failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley*, 960 S.W.2d at 580. "Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 697).

The test for deficient performance is whether counsel's acts or omissions fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 688; *Henley*, 960 S.W.2d at 579. This Court must evaluate the questionable conduct from the attorney's perspective at the time, *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982), and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999). A defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). This Court will not use hindsight to second-guess a reasonable trial strategy, *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994), even if a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting *Goad*, 938 S.W.2d at 369). However, this deference to the tactical decisions of trial counsel is dependent upon a showing that the decisions were made after adequate preparation. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Even if a petitioner shows that counsel's representation was deficient, the petitioner must also satisfy the prejudice prong of the *Strickland* test in order to obtain relief. Prejudice is shown where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Burns*, 6 S.W.3d at 463 (quoting *Strickland*, 466 U.S. at 694). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Id.*

Whether a petitioner has been denied the effective assistance of counsel presents a mixed question of law and fact. *Burns*, 6 S.W.3d at 461. This Court will review the post-conviction court's findings of fact "under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise." *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001) (citing Tenn. R. App. P. 13(d); *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). This Court will not re-weigh or re-evaluate the evidence presented or substitute our own inferences for those drawn by the post-conviction court. *Henley*, 960 S.W.2d at 579. Questions concerning witness credibility, the weight and value to be given to testimony, and the factual issues raised by the evidence are to be resolved by the post-conviction court. *Momon*, 18 S.W.3d at 156 (citing *Henley*, 960 S.W.2d at 578). However, the post-conviction court's conclusions of law and application of the law to the facts are reviewed under a purely de novo standard, with no presumption of correctness. *Fields*, 40 S.W.3d at 458.

Petitioner claims that trial counsel provided ineffective assistance by failing to have the testimony of some of the State's medical experts excluded on the basis that their bias to protect themselves and their employer from liability rendered their testimony improper under Tennessee Rule of Evidence 702. For the same reason, Petitioner claims that trial counsel should have argued that the expert testimony was irrelevant under Tennessee Rule of Evidence 402 and unfairly prejudicial under Tennessee Rule of Evidence 403. The State argues that potential bias is an issue for cross-examination on the credibility of the witnesses and is not a basis for wholesale exclusion of the medical expert testimony.

"If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. Questions regarding the qualifications, admissibility, relevancy, and competency of expert testimony are matters left within the broad discretion of the trial court. *See McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 263-64 (Tenn. 1997); *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993). The determining factor is "whether the witness's qualifications authorize him or her to give an informed opinion on the subject at issue." *State v. Stevens*, 78 S.W.3d 817, 834 (Tenn. 2002).

Petitioner has not cited any case for the proposition that potential bias is an adequate basis for disqualification or exclusion of expert testimony. We agree with the State that this is an issue of witness credibility. *See* Tenn. R. Evid. 616 ("A party may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness."). Moreover, we fail to see how potential bias would render an expert's opinion testimony so inherently unreliable that it would be inadmissible under the evidentiary rules regarding expert testimony. In *McDaniel*, our supreme court gave substantial guidance on the proper factors for evaluating the validity of expert testimony. *See* 955 S.W.2d at 265 (identifying five non-exclusive factors for determining the reliability of expert testimony). "Once the evidence is admitted, it will thereafter be tested with the crucible of vigorous cross-examination and countervailing proof." *Id.* Also, we do not see any reason that potential bias would have rendered the testimony irrelevant or otherwise inadmissible. *See* Tenn. R. Evid. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."); Tenn. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."). Because potential bias was not a viable argument for exclusion of the

medical expert testimony in this case, trial counsel were not deficient for not making such an argument. *See Carpenter v. State*, 126 S.W.3d 879, 887-88 (Tenn. 2004).

Petitioner also argues that trial counsel provided ineffective assistance by failing to impeach Dr. McMaster with a prior inconsistent statement. We acknowledge that prior inconsistent statements may be used to impeach a witness, Tenn. R. Evid. 613; however, Petitioner has not identified exactly what sworn testimony should have been used to impeach Dr. McMaster. Petitioner points to testimony from her uncle at the post-conviction hearing, in which he said that he was surprised by Dr. McMaster's testimony at trial about the existence of an additional bone fracture. Petitioner's uncle explained that this testimony was inconsistent with Dr. McMaster's prior testimony at the *McDaniel* hearing wherein she said that, in reaching her expert opinion, she relied on the findings of the radiologists, but none of those radiologists discovered the particular bone fracture to which Dr. McMaster testified about at trial. Petitioner's uncle acknowledged that he extensively cross-examined Dr. McMaster about this discrepancy at trial.

Petitioner has not presented any evidence that her uncle failed to utilize prior sworn testimony to aid in this regard. Instead, he opined at the post-conviction hearing that, if the trial court had allowed him to question Dr. McMaster at the *McDaniel* hearing about all of the specific fractures upon which she was basing her conclusion and had Dr. McMaster failed to identify the particular fracture at that time, then that testimony would directly contradict her testimony at trial. However, that testimony did not materialize at the *McDaniel* hearing due to the trial court's ruling,[1] and Petitioner has not shown what more trial counsel could have done to impeach Dr. McMaster on this issue at trial beyond cross-examination. We cannot say that trial counsel was deficient for not introducing prior inconsistent testimony.

Closely related, Petitioner also argues that trial counsel provided ineffective assistance by not seeking to introduce prior testimony from the juvenile court proceedings to impeach some of the State's medical experts. Petitioner's uncle testified that he was under the impression that the trial court prohibited them from using any prior testimony from the juvenile court proceedings. Co-counsel, however, did not recall such a blanket ruling, and testified that the trial court only prohibited mentioning the outcome of that litigation. Regardless of whether the trial court issued such a ruling, Petitioner has not pointed to any prior statements from the juvenile court proceedings that would have assisted her case. Contrarily, Petitioner's uncle stated that were no prior statements for him to use with regard to Drs. Heller and Greeley because they testified consistently in both proceedings. If prior inconsistent testimony was available for some of the other

---

[1] We note that while Petitioner's uncle testified at the post-conviction hearing that he wished that they would have appealed the trial court's *McDaniel* ruling, that issue has not been raised by Petitioner in this post-conviction proceeding.

medical experts, Petitioner has not identified it. *See id.* Because Petitioner has not proven the availability of any favorable prior inconsistent testimony, she has failed to prove that trial counsel acted deficiently by not attempting to introduce that evidence.

Last, Petitioner argues that her uncle provided ineffective assistance because he was simply too inexperienced with criminal law and procedure to effectively represent her. Aside from the claims previously addressed in this opinion, Petitioner has not pointed to any specific deficient performance by her uncle that prejudiced the outcome of her trial. Inexperience alone does not amount to ineffective assistance of counsel. *Andre Bland v. State*, No. W2007-00020-CCA-R3-PD, 2009 WL 910197, at *39 (Tenn. Crim. App. Apr. 3, 2009), *perm. app. denied* (Tenn. Aug. 17, 2009). Petitioner's uncle responsibly chose to associate with an experienced criminal defense attorney to assist with this case, and the post-conviction court found that Petitioner's uncle was "adept" and "well versed" in his representation. Because Petitioner has not specifically identified any deficient conduct by her uncle that prejudiced the outcome of her trial, she is not entitled to any relief.

*Conclusion*

Based on the foregoing, the decision of the post-conviction court is affirmed.

_____
TIMOTHY L. EASTER, JUDGE